UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

TONEY W.,

Plaintiff,

- against -

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

--------------------------------------------------------------x

**25 Civ. 4112 (GS)**

**OPINION AND ORDER**

**GARY STEIN, United States Magistrate Judge:**

Plaintiff Toney W. ("Toney" or "Plaintiff") seeks judicial review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), of a final determination of the Commissioner of Social Security (the "Commissioner") denying his claim for social security disability benefits. Plaintiff moves for reversal of the administrative decision denying his claim and remand for additional proceedings. (Dkt. No. 11). For the reasons set forth below, Plaintiff's motion is **GRANTED** and the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

### A. Procedural History

On January 24, 2023, Plaintiff filed an application for Social Security Disability ("SSD") benefits under Title II of the Social Security Act and alleged a disability onset date of December 18, 2021. (Dkt. No. 8, Administrative Record ("AR") 56, 76–77, 139–40). The Social Security Administration ("SSA") initially denied Syed's applications on July 26, 2023 (AR 56, 80–84), and again after

reconsideration on November 7, 2023 (AR 69, 88–89). Toney requested a hearing before an Administrative Law Judge ("ALJ") on November 15, 2023. (AR 91–93).

A hearing was conducted before ALJ Vincent M. Cascio on May 14, 2024. (AR 30–55). In a decision issued on June 4, 2024 (the "ALJ Decision"), ALJ Cascio found that Toney was not disabled within the meaning of the Social Security Act and thus denied his application for benefits. (AR 14–29). On March 12, 2025, the Appeals Council denied Toney's request for review of the ALJ Decision, which thus became the Commissioner's final decision. (AR 1–6).

Toney timely filed his Complaint, seeking review of the ALJ Decision, on May 15, 2025. (Dkt. No. 1). Toney filed his brief requesting reversal of the ALJ's Decision with remand, pursuant to Section 6 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405, on September 15, 2025. (Dkt. No. 11 ("Pl. Br.")). The Commissioner filed a brief on December 2, 2025 opposing Toney's motion and requesting that the Commissioner's final decision be affirmed. (Dkt. No. 14 ("Gov. Br.")). Toney filed a reply brief on December 16, 2025. (Dkt. No. 15 ("Reply")).

**B. Administrative Record**

Toney was 61 years old when he applied for SSD benefits in 2023. (AR 139). He studied up to tenth grade, and thereafter received specialized training in welding, which he completed in 1986. (AR 182; *see also* AR 38). Plaintiff also appears to have obtained a GED in 1981. (AR 61, 68, 173, 488). Plaintiff has a long

history of work experience, from 1986 to 2022, the majority of which he spent as a welder. (AR 161, 173, 182–83, 209).

Toney's claimed disability included cataracts, pressure under his right eye, and pain in his eyes. (AR 57, 172). Toney alleged that following an injury at work, when a piece of metal hit him in the left eye, he ultimately lost total sight in that eye. (AR 219, 181). Following a deterioration of his vision and increased pain in his eyes, Toney was forced to stop working in November 2022. (AR 61, 90, 172).[1]

Toney was primarily treated by Dr. Wen-Jeng M. Yao, an ophthalmologist at Montefiore Einstein in the Bronx. (AR 356–83, 502–84). Beginning on January 30, 2023, following an appointment in which Toney complained of constant tearing and pain, Dr. Yao determined that Plaintiff had lost full vision in his left eye and was in danger of losing vision in his right eye from glaucoma. (AR 358–59). Dr. Yao noted that Plaintiff had become blind in the left eye after not proceeding with recommended glaucoma surgery. (*Id.*). Due to the symptoms and the tests run, Dr. Yao suspected glaucoma in Plaintiff's right eye. (AR 361, 570).

On May 17, 2023, Plaintiff followed up with Dr. Yao, complaining of pain in both eyes and blurry vision. (AR 373). Dr. Yao maintained her diagnosis of suspected glaucoma and prescribed glaucoma eyedrops. (AR 373, 400, 402, 569). Dr. Yao wrote a letter on that same date stating that Toney "is blind in his left eye" and "appears to have glaucoma in the right eye," and advising that he "will need

[1] Elsewhere, including in his testimony at the ALJ hearing, Toney said he last worked on December 17, 2021. (AR 39, 181, 337).

continued follow up for his right eye to ensure that he doesn't lose his vision in that eye as well." (AR 368).

On June 4, 2023, Plaintiff was seen at the Wakefield Emergency Department by Dr. Jenny Zhao for eye swelling, burning, and difficulty seeing over the prior few days. (AR 387–88). Later that day, Plaintiff was seen by an ophthalmologist, Dr. Andrea Nortey, who noted a chalazion (a bump on the eyelid) above Plaintiff's left eye and made certain recommendations. (AR 400–03). Pursuant to that evaluation, Plaintiff was prescribed Maxitrol (a medication for eye inflammation), warm compresses, and artificial tears. (AR 391; *see also* AR 400). Plaintiff saw Dr. Yao for a follow up on June 14, 2023, whose conclusions were consistent with her earlier evaluations. (AR 547–49).

On June 22, 2023, Toney completed an eye examination with Dr. Lou Kushner at the request of the SSA. (AR 433). Dr. Kushner diagnosed Plaintiff with glaucoma, a chalazion on the left eyelid, nuclear sclerosis of the right eye, aphakia in the left eye, and no light perception in the left eye. (AR 436; *see also* AR 434).[2] A visual field test found that Toney's right eye was "not reliable" (the left eye was not tested because it had no light perception). (AR 435). Plaintiff reported, *inter alia*, that he sometimes needs help at home, but tries to cook, dresses himself, and socializes with friends. (AR 433). Dr. Kushner observed that Plaintiff was able to

[2] Nuclear sclerosis, which is part of the natural aging process, refers to cloudiness, hardening, and yellowing of the lens of the eye. *See* Healthline, "What is Nuclear Sclerosis?", available at https://www.healthline.com/health/nuclear-sclerosis (last visited Sept. 17, 2026). Aphakia refers to the absence of the eye's natural lens. *See* American Academy of Ophthalmology, "What Is Aphakia?", available at https://www.aao.org/eye-health/diseases/what-is-aphakia (last visited Sept. 17, 2026).

navigate and maneuver objects without assistance, and was able to read with near-vision correction. (AR 435).

On July 6, 2023, complaining of an eye lesion, Plaintiff was seen for an eye examination by Dr. Anne Barmettler, who diagnosed Plaintiff with a benign neoplasm of skin on his right eyelid, dermatochalasis of the right eyelid, and blindness of the left eye. (AR 539).

On July 17, 2023, a state agency medical consultant, Dr. S. Naroditsky, reviewed the record evidence available at that time, resulting in a non-examining medical opinion that Plaintiff was "not disabled." (AR 57–62). Dr. Naroditsky noted that Toney had medically determinable impairments of low vision and glaucoma, both of which Dr. Naroditsky described as severe and could have reasonably been expected to produce the alleged symptoms. (AR 59). In assessing Toney's residual functional capacity ("RFC"), Dr. Naroditsky found that Toney had no exertional, postural, or manipulative limitations. (AR 60). Dr. Naroditsky found that Toney had "visual limitations," including, in his left eye, "limited" near acuity, far acuity, depth perception, accommodation, and color vision, and, in his right eye, "limited" field of vision. (*Id.*). In support of those assessments, Dr. Naroditsky explained that they were based on the total lack of light perception and aphakia in Toney's left eye. (*Id.*). Dr. Naroditsky made no further comments on the severity of Toney's visual limitations. (*See* AR 57–62).

On October 18, 2023, Plaintiff again saw Dr. Yao with complaints of significant burning, tearing, and pain in his right eye. (AR 526, 529). For the first

time, Dr. Yao diagnosed Plaintiff with "Primary open angle glaucoma (POAG) of [the] right eye, moderate stage," and discussed with Plaintiff the possibility of a trabeculoplasty, a form of laser surgery, to potentially decrease eye pressure in his right eye due to the glaucoma. (AR 526–27). Dr. Yao described Plaintiff's IOP (intraocular pressure) as "high" and "elevated." (AR 527). Dr. Yao noted that Plaintiff had run out of his eye drops three months before. (*Id.*). She prescribed him new drops and again recommended the use of artificial tears. (AR 532).

On October 19, 2023, another state agency consultant, Dr. S. Ahmed, reviewed the record evidence available at that time and, similar to Dr. Naroditsky, provided a non-examining medical opinion that Plaintiff was "not disabled." (AR 63–68). Dr. Ahmed similarly found that Toney had severe medically determinable impairments of low vision and glaucoma, both of which could have reasonably been expected to produce the alleged symptoms. (AR 65). In the RFC section of his opinion, Dr. Ahmed also described Toney as having visual limitations in his left eye including near acuity, far acuity, depth perception, accommodation, color vision, and field of vision, noting a total lack of light perception and aphakia in Toney's left eye. (AR 66). Dr. Ahmed similarly pointed to the total lack of light perception and aphakia in Toney's left eye as the facts supporting those conclusions. (*Id.*). Differing from Dr. Naroditsky, Dr. Ahmed did not note any visual limitations affecting Plaintiff's right eye. (*See id.*). Dr. Ahmed also made no further comments on the severity of Toney's visual limitations. (*See* AR 63–68).

On November 2, 2023, Toney returned to Dr. Yao with more complaints of significant burning, tearing, and pain in the right eye, as well as swelling of his eyelids. (AR 513). On that date, Dr. Yao performed a trabeculoplasty of the right eye. (AR 517, 524). On February 1, 2024, Plaintiff followed up with Dr. Yao, who continued to classify Toney's right-eye glaucoma as moderate, noted that his eye pressure was acceptable, and recommended close follow up. (AR 505, 508).

Toney's visual acuity fluctuated and generally appeared to deteriorate over the course of these visits. During his January 30, 2023 and May 17, 2023 visits with Dr. Yao, Plaintiff's right eye visual acuity was 20/30. (AR 360, 380, 560, 575). During his visit to the emergency room on June 4, 2023, visual acuity was measured at 20/50 by the emergency department (AR 388) and 20/40 during the ophthalmology evaluation (AR 401). Dr. Kushner's June 22, 2023 examination found Toney's visual acuity at 20/30. (AR 433). The July 6, 2023 examination resulted in a reading of 20/50. (AR 458). At the October 18, 2023 examination, Dr. Yao measured visual acuity at 20/60. (AR 530). The test performed during the November 2, 2023 examination resulted in a reading of 20/50. (AR 519). Finally, during the February 1, 2024 examination, visual acuity without correction was measured at 20/50 (20/40 with pinhole correction). (AR 507, 509).

**C. Hearing**

At the May 14, 2024 hearing before ALJ Cascio, Toney testified about his education, employment history, activities of daily living, and the impact of his claimed disability. (AR 37–44).

Toney testified that he no longer drove, as traffic lights would irritate his eyes. (AR 38). He further testified that he spent most of his time with his girlfriend, and that when they traveled they typically took alternative transportation, such as a taxi. (*Id.*). Toney testified that he ceased his welding work because his eyesight "was getting so bad." (AR 39). He said his left eye was completely blind, and that his right eye was blurry at times and experienced pain and watering, so he used medication as prescribed by his doctor. (AR 39–40). He recounted that he had been diagnosed with glaucoma, and that doctors had warned him that he may need surgery because of possible cataracts. (AR 40).

Due to his impaired vision, Toney testified that he "constantly" hits a wall inside his house because he does not see it on the way to the bathroom. (AR 41). When ALJ Cascio asked whether his depth perception was "off," Toney testified that it was, and that he has to "hold on" when walking up sidewalks and staircases. (*Id.*). He further testified that watching television "burns" his eyes, and that he usually uses a magnifying glass to read and write. (AR 42). Additionally, Toney testified that he was frequently off-balance as his "height judgment [wa]s off" when stepping off curbs or stairs, and that he had recently fallen into a three-foot deep ravine that he mistakenly believed was on level ground. (AR 42–43).

Plaintiff testified that he is able to dress himself and occasionally cook "noodles or stuff like that" for himself, but that his girlfriend typically cooks for him and takes responsibility for cleaning their home. (AR 43). Toney also testified that he would not go shopping alone because he sometimes feels uncomfortable "being

out there by" himself and that he "probably" could not find his way home alone. (AR 43–44). Although Plaintiff still socializes, he testified that he normally does so "on the phone" or when people "come by." (AR 44).

The sole other witness at the hearing was a vocational expert, Joseph Atkinson. Atkinson testified that Toney's prior jobs involved heavy or medium work and that Toney did not have skills that allowed him to be transferred to only light or sedentary work. (AR 47–48). Atkinson further testified as to certain hypotheticals put forward by ALJ Cascio and Toney's counsel.

In hypothetical one, ALJ Cascio asked about a person with Toney's age, education, and work history, and a residual functional capacity to perform a full-range of medium work except that they could not climb ropes, ladders or scaffolds, could endure no exposure to unprotected heights or hazardous machinery, had monocular vision limited to jobs with frequent depth perception and frequent peripheral vision, could only occasionally work with small objects, had frequent far visual acuity, and had the ability to work with large objects and avoid hazards in the workplace such as boxes on the floor, doors ajar, approaching vehicles, and people. (AR 48–49). Atkinson testified that such a person would be unable to perform any of Toney's past relevant work. (AR 49).

The ALJ then asked if there were any jobs in the national economy that such a person could perform. Atkinson replied that there were—that such a person would be able to perform work as a hand launderer, laboratory equipment cleaner, and kitchen helper (dishwasher). (AR 49). Further, Atkinson testified that a

similar person as in hypothetical one who would be off task 20% of the workday in addition to regularly scheduled breaks would be unable to find work in the national economy. (AR 50).

On cross-examination, Toney's counsel asked Atkinson whether the person described in the ALJ's hypothetical would be able to perform any of the jobs Atkinson identified if, instead of having frequent depth perception and far visual acuity, the person had only occasional depth perception and far visual acuity. (AR 50–51). In response, Atkinson first explained that the applicable regulations did not specify a level of depth perception or far visual acuity for some positions, including the laboratory equipment cleaner position. (AR 51). Nonetheless, Atkinson testified that in his experience, someone with those limitations who could "only occasionally be able to actually perceive" objects within a few feet from themselves would be "preclude[d]" from the previously identified jobs and would be "eliminate[d from] any competitive employment." (AR 52).

Upon further questioning from ALJ Cascio, Atkinson testified that those jobs would be impacted by monocular vision, because it would "make working around fast moving objects difficult." (AR 52–53). Further, although monocular vision would not independently preclude performance of such jobs, "impaired visual acuity bilaterally" would preclude such employment, given the requirement to have depth perception capable of handling small objects. (AR 53–54).

### D. ALJ Decision

In his June 4, 2024 decision, ALJ Cascio found that Toney suffered from the following severe impairments: glaucoma in his right eye, chalazion in his left upper lid, nuclear sclerosis in his right eye, aphakia in his left eye, no light perception vision in his left eye, and status post penetrating trauma. (AR 20). Nonetheless, the ALJ found that none of Toney's impairments meet or medically equal the severity of one of the listed impairments under 20 CFR 404.1520(d) or 404.1526. (*Id.*).

The ALJ concluded that Toney retained RFC to perform medium work as defined in 20 CFR 404.1567(c), except that he cannot climb ropes, ladders, or scaffolds and he cannot be exposed to unprotected heights or hazardous machinery. (*Id.*). Further, the ALJ concluded that Toney had right monocular vision limited to jobs with frequent depth perception and frequent peripheral vision, that he could only occasionally work with small objects such as nuts or screws, that he can only engage in frequent far visual acuity, and that he had the ability to work with large objects and avoid hazards in the workplace such as boxes on the floor, doors ajar, approaching vehicles, and people. (*Id.*).

In making the finding of RFC suitable to perform medium work with the listed exceptions, the ALJ found that Toney's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Toney's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence

in the record." (AR 21). In particular, the ALJ found Toney's described daily activities were "not limited to the extent one would expect" given his complaints of disabling symptoms and limitations. (AR 21–22). The ALJ specifically noted how in his function report, Toney indicated that he was able to "perform personal care at his own pace," accompany "his girlfriend to the grocery store," pay "bills and count[] change," watch TV, "listen[] to music," "talk[]" on the phone and in person, and get along with others. (AR 22).

Further, the ALJ found that although Toney had "received treatment for the allegedly disabling impairments, records indicate that [he] has undergone conservative care with eye drops prescribed." (*Id.*). "There is no evidence of any other medical treatment." (*Id.*). The ALJ found that Toney's right eye vision had been "stable at 20/30 to 20/40," that Dr. Kushner had found Toney able to "navigate, and maneuver objects without assistance," and that Toney was able to read without difficulty with near-vision correction. (*Id.*). As such, the ALJ found that Toney's eye impairments limited him to "tasks that require only frequent depth perception and peripheral vision and occasional work with small objects, as well as work which requires frequent far visual acuity." (*Id.*). Finally, the ALJ found Dr. Kushner's opinion "persuasive" and the opinions by Dr. Naroditsky and Dr. Ahmed "partially persuasive." (*Id.*).

Citing the vocational expert's testimony, the ALJ then found that, while Toney was unable to perform his past relevant work (as a salvage laborer, industrial truck operator, construction worker, or welder), "there are jobs that exist

in significant numbers in the national economy that [Toney] can perform"—specifically, the occupations identified by the vocational expert (hand launderer, laboratory equipment cleaner, and kitchen helper). (AR 22–23). The ALJ therefore concluded that Toney "has not been under a disability, as defined in the Social Security Act, from December 18, 2021, through the date of this decision" and denied Toney's application for SSD benefits. (AR 24).

## LEGAL STANDARDS

### A. Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the Commissioner "in the district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by "substantial evidence." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (cleaned up).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to 'substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review.'" *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949

F.2d 57, 59 (2d Cir. 1991)). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Conklin v. Kijakazi*, No. 21 Civ. 8486 (JLC), 2023 WL 104829, at *7 (S.D.N.Y. Jan. 5, 2023) (quoting *Brault*, 683 F.3d at 448). However, the application of this principle "presupposes that the ALJ has not disregarded or misconstrued relevant evidence and has not applied incorrect legal standards." *Rubin v. O'Malley*, 116 F.4th 145, 155 (2d Cir. 2024).

In weighing whether substantial evidence supports the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (citation omitted). Based on this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (citation omitted).

### B. Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* *Colgan v. Kijakazi*, 22 F.4th 353, 357–59 (2d Cir. 2022). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Social Security Administration has outlined a five-step, sequential evaluation process to determine whether a claimant is disabled." *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (cleaned up); *see* 20 C.F.R. § 404.1520(a)(4). The steps are followed in order; if it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. *Manzanares v. Comm'r of Soc. Sec.*, No. 22 Civ. 1898 (SN), 2023 WL 4350651, at *4 (S.D.N.Y. July 5, 2023). The Second Circuit has described the five-step process as follows:

> *First*, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner *next* considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the *third* inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the *fourth* inquiry is whether, despite the claimant's severe impairment, she has the residual

> functional capacity ["RFC"] to perform her past work. *Finally*, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (emphasis added); *see* 20 C.F.R. § 404.1520(a)(4)(i)–(v).

The claimant bears the burden of proof as to steps one through four; the Commissioner bears the burden as to step five. *See Manzanares*, 2023 WL 4350651, at *4 (citing *Selian*, 708 F.3d at 418).

### C. The ALJ's Duty to Develop the Record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996); *see also Rodriguez ex rel. Silverio v. Barnhart*, No. 02 Civ. 5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law."). "[This duty] exists even when, as here, the claimant is represented by counsel. This duty exists where there are obvious gaps in the administrative record." *De Camacho v. O'Malley*, 717 F. Supp. 3d 354, 367 (S.D.N.Y. 2024) (cleaned up). "In fact, where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history." *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999).

However, the ALJ's duty to develop the record, while "'robust,'" is "'not unlimited.'" *Angela Lynn H. v. Comm'r of Soc. Sec.*, No. 24 Civ. 4107 (GRJ), 2025 WL 1369400, at *4 (S.D.N.Y. May 9, 2025) (quoting *Clarke v. Comm'r of Soc. Sec.*,

No. 19 Civ. 7213 (BCM), 2021 WL 2481909, at *13 (S.D.N.Y. June 16, 2021)). "Where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (citation omitted). Further, counsel for a claimant also has affirmative duties to obtain and submit evidence at each level of the administrative review process. *Melissa I. o/b/o R.J.R.D. v. Comm'r of Soc. Sec.*, No. 20 Civ. 1799 (WBC), 2022 WL 3358138, at *3–4 (W.D.N.Y. Aug. 15, 2022) (citing Social Security Ruling ("SSR") 17-4p, 2017 WL 4736894 at *4; 20 CFR § 416.1540(b)).

In considering any medical opinions set forth in the administrative record, the ALJ should give the opinion of a claimant's treating physician "'controlling weight' if it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Ocasio v. Colvin*, No. 12 Civ. 6002 (JG), 2013 WL 1395846, at *9 (E.D.N.Y. Apr. 5, 2013) (quoting 20 C.F.R. § 404.1527(d)(2)). Because the "treating physician rule dovetails with the ALJ's affirmative duty to develop the administrative record," the "duty of the ALJ is 'particularly important when it comes to obtaining information from a claimant's treating physician.'" *Id.* (quoting *Devora v. Barnhart*, 205 F. Supp. 2d 164, 172 (S.D.N.Y. 2002)). Accordingly, the ALJ's obligation to develop the record "includes obtaining the treating physicians' assessments of the claimant's RFC." *Id.* It is appropriate to "remand[] to the

Commissioner with directions to develop the administrative record further and to reconsider" where necessary to ensure an accurate assessment of a claimant's entitlement to benefits based on a fully developed record. *Burger v. Astrue*, 282 F. App'x 883, 885 (2d Cir. 2008).

**D. Evaluation of Claimant's Testimony**

Social Security regulations require a two-step process for evaluating a claimant's subjective statements about the intensity, persistence, and limiting effects of his or her symptoms. First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(b)). "Second, the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010).

Where "findings are supported by substantial evidence, 'the court must uphold the ALJ's decision to discount a claimant's subjective complaints[.]'" *Them v. Colvin*, No. 14 Civ. 7580 (PKC), 2015 WL 10635499, at *9 (S.D.N.Y. Dec. 22, 2015) (quoting *Aponte v. Sec'y, Dep't of Health & Hum. Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984)); *see also Vargas v. Astrue*, No. 10 Civ. 6306 (PKC), 2011 WL 2946371, at *15 (S.D.N.Y. July 20, 2011) ("An ALJ may properly make such a credibility decision if her decision, after reviewing the medical findings and other

evidence in the record, is supported by substantial evidence."). "'[C]redibility findings of an ALJ are entitled to great deference' and are reversible only if they are 'patently unreasonable.'" *Torres v. Comm'r of Soc. Sec.*, No. 22 Civ. 03 (MJP), 2024 WL 5090815, at *4 (W.D.N.Y. Dec. 12, 2024) (citation omitted).

"In assessing a claimant's credibility, the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony." *Alcantara v. Astrue*, 667 F. Supp. 2d 262, 277 (S.D.N.Y. 2009) (citing *Lugo v. Apfel,* 20 F.Supp.2d 662, 663 (S.D.N.Y. Sept. 28, 1998)). "A finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983)). "Where the ALJ fails sufficiently to explain a finding that the claimant's testimony was not entirely credible, remand is appropriate." *Valet v. Astrue*, No. 10 Civ. 3282 (KAM), 2012 WL 194970, at *22 (E.D.N.Y. Jan. 23, 2012) (citing *Tornatore v. Barnhart*, No. 05 Civ. 6858 (GEL), 2006 WL 3714649, at *6 (S.D.N.Y. Dec. 12, 2006)).

**DISCUSSION**

Toney argues that the ALJ erred in concluding that Toney retained the capacity for frequent depth perception; that the ALJ's RFC determination at step four was therefore flawed; and that Toney is not, in fact, able to perform the jobs identified by the vocational expert, as the ALJ found at step five. (Pl. Br. at 1, 6–8).

Based on a thorough review of the record, the ALJ Decision, and the relevant legal authorities, the Court agrees that a remand is required.

Under the hypothetical that ALJ Cascio laid out to the vocational expert, a person substantially similar to Toney who has *frequent* depth perception and peripheral vision would be able to perform jobs such as a hand launderer, laboratory equipment cleaner, and kitchen helper, so long as they did not need to be off task 20% of the work day in addition to regularly scheduled breaks. (AR 49–50). Meanwhile, as the vocational expert testified in response to the hypothetical posed by Toney's counsel, a person substantially similar to Toney who can only *occasionally* be able to actually perceive objects within a few feet from themselves due to a lack of depth perception would be "preclude[d]" from the identified jobs and would be "eliminate[d from] any competitive employment." (AR 52).

The degree to which Toney's vision issues impaired his depth perception was therefore critical to the ultimate determination of whether Toney was disabled. If the ALJ properly found that Toney's RFC allowed him to perform work that required "frequent" depth perception, then the vocational expert's testimony that such a person could find work as a hand launderer, laboratory equipment cleaner, or kitchen helper (which Toney does not appear to dispute) would mean that Toney was not disabled within the meaning of SSA regulations. On the other hand, if Toney's RFC allowed him to function only in jobs requiring "occasional," but not frequent, depth perception, then the vocational expert's testimony that such a person could not perform those jobs (which the Commissioner does not appear to

dispute) would invalidate the ALJ's conclusion that there were jobs in the national economy that Toney could perform, and he would be disabled. "Frequent" and "occasional" are terms of art in SSA parlance: "frequent" is defined "as occurring from one-third to two-thirds of the time," while "occasional" refers to activity "that occurs up to one-third of the time." *Stottlar v. Colvin*, No. 13 Civ. 47 (TJM), 2014 WL 3956628, at *15 (N.D.N.Y. Aug. 13, 2014).

Plainly, and as the ALJ found, Toney's visual impairments—including blindness in the left eye and glaucoma in the right eye—limited his depth perception to *some* degree. (*See* AR 22 (stating that "the claimant's monocular vision" entails "limitations of depth perception and field of vision")). The key question on this appeal is whether the record supports the ALJ's finding that Toney could perform jobs requiring "frequent" depth perception. Where an ALJ's finding regarding the degree to which a claimant's visual limitations affect his vocational opportunities is not adequately explained or supported by the record, courts have remanded the case for further proceedings. *See, e.g.*, *Decambre v. Colvin*, No. 14 Civ. 6864 (JS), 2016 WL 951532, at *9 (E.D.N.Y. Mar. 8, 2016) (finding that "remand is appropriate to permit the ALJ to develop the record" because "a clearer explanation is required as to [p]laintiff's depth perception"); *Kara K. v. Bisignano*, No. 23-CV-521, 2025 WL 3199070, at *3–4 (N.D. Ill. Nov. 17, 2025) (remanding for further clarification where ALJ did not adequately explain his reasoning for only limiting plaintiff to jobs requiring "frequent" depth perception in light of plaintiff's "monocular vision, which significantly affects her depth perception"); *Daniel E.S. v.*

*Saul*, No. 18CV03069MJDECW, 2020 WL 1172130, at *9 (D. Minn. Jan. 28, 2020) (finding remand appropriate because "the ALJ'S RFC as to depth perception is not supported by substantial evidence based on the present record"), *R&R adopted*, 2020 WL 1169483 (D. Minn. Mar. 11, 2020); *Reed v. Berryhill*, No: 8:17-cv-679-T-DNF, 2018 WL 4520363, at *4 (M.D. Fla. Sept. 21, 2018) (remand required where "substantial evidence does not support the ALJ's visual limitation findings" and the ALJ "provided no explanation as to how he determined Plaintiff's visual limitations," including his finding that plaintiff's left eye blindness and right eye 20/25 vision limited her to only "frequent depth perception").

The Commissioner relies on four categories of evidence in arguing that substantial evidence supports the ALJ's RFC finding on this point. Those categories are (1) the consultative examination by Dr. Kushner; (2) the opinions of Dr. Naroditsky and Dr. Ahmed, the non-examining state agency consultants; (3) additional medical records; and (4) Plaintiff's reported activities of daily living. (Gov. Br. at 8–10). The Court discusses each of these below.

**A. Dr. Kushner's Report**

First, the Commissioner argues that Dr. Kushner's report provides independently substantial evidence for a finding of frequent depth perception. (Gov. Br. at 8–9). The Commissioner notes that Dr. Kushner's report contains an entry that Dr. Kushner "observed [Toney to be] able to navigate, and maneuver objects without assistance" (AR 435), which the Commissioner labels as Dr. Kushner's "medical opinion." (*Id.* at 8). The Commissioner further argues that the ALJ

properly found Dr. Kushner's report persuasive because it is supported by Dr. Kushner's findings that Toney had 20/30 vision in his right eye and Plaintiff's report of certain activities of daily living. (*Id.* at 8–9).

The Court disagrees. As an initial matter, it is not obvious that Dr. Kushner's observations about Toney's ability to navigate and maneuver objects qualifies as a medical opinion at all, let alone an opinion supporting a finding of "frequent depth perception." *See Muhammad v. Colvin*, No. 16 Civ. 6369 (MAT), 2017 WL 4837583, at *3 (W.D.N.Y. Oct. 26, 2017) ("Simply because a statement appears in an acceptable medical source's notes does not automatically transform it into a 'medical opinion.'"); *see also Cuddihy v. Comm'r of Soc. Sec.*, No. 19 Civ. 918 (LJV), 2020 WL 4548030, at *2 (W.D.N.Y. Aug. 6, 2020) ("A one-line statement, unsupported by any specific findings or diagnostic testing, does not constitute a medical 'opinion.'").

If the notation in Dr. Kushner's report did constitute a medical opinion, it provides, at best, "minimal support for the ALJ's determination," as it "discusses neither the evidence that supports its conclusions nor the specific facts upon which its conclusions are based." *Verdaguer v. Colvin*, No. 12 Civ. 6858 (VB), 2013 WL 6426931, at *11 (S.D.N.Y. Dec. 9, 2013). It is entirely unclear what testing, if any, Dr. Kushner had Toney undergo to make an assessment of Toney's navigational abilities. As Toney notes, Dr. Kushner may have reached this conclusion merely by watching Toney in "a physician's office where hopefully there would be no objects to trip over and no uneven terrain." (Reply at 2).

Moreover, taking Dr. Kushner's notation at face value would suggest that Toney had no issues with depth perception. Yet that would be at odds with the other findings in his report, such as that Toney had "no light perception" in his left eye and that visual field testing revealed that his right eye was "not reliable" and exhibited "superonasal and superotemporal defects with fair reliability," indicating reduced vision in the upper visual field of Toney's right eye.[3] (AR 435). And Dr. Kushner's report does not contain any RFC assessment. *See Ellison v. Colvin*, No. CIV. 14-2022, 2015 WL 846540, at *3 (W.D. Ark. Feb. 26, 2015) ("A general physical exam conducted by a one time examining physician is of little or no value to the undersigned if it does not include an RFC assessment complete with an explanation of the physician's findings and a basis for the restrictions imposed."). In short, the report is not sufficiently specific to provide meaningful support for the ALJ's RFC finding as to the functional limitations arising from Plaintiff's limited depth perception.

Accordingly, Dr. Kushner's report does not, on its own, provide sufficient support for the ALJ's RFC determination. *See Verdaguer*, 2013 WL 6426931, at *11 (rejecting Commissioner's suggestion that SSA examining doctor's report constituted substantial evidence for the ALJ's RFC determination as "unconvincing" because the doctor's "assessment that [p]laintiff suffered from 'a permanent partial visual disability as a result of blindness in his left eye,' is equivocal, at best, and

[3] *See* NYSORA, "Local and Regional Anesthesia for Ophthalmic Surgery", available at https://nysora.com/regional-anesthesia/topics/regional-anesthesia-for-specific-surgical-procedures/head-and-neck/ophthalmic/local-regional-anesthesia-ophthalmic-surgery/ (last visited Sept. 17, 2026).

does not even mention the extent to which [p]laintiff's left eye impairment affected his depth perception or peripheral vision").

**B. Dr. Naroditsky's and Dr. Ahmed's Reports**

Next, the Commissioner argues that the ALJ appropriately limited Toney's capabilities based on the reports by Drs. Naroditsky and Ahmed. (Gov. Br. at 9). The Commissioner contends that the ALJ "fully accounted" for these assessments by limiting Toney "to work with frequent depth perception and peripheral vision involving only occasional work with only small objects." (*Id.*).

In making their RFC assessments, both doctors indicated that Toney's depth perception was "[l]imited [l]eft." (AR 60, 66). Dr. Naroditsky also found that Toney's field of vision was "[l]imited [r]ight" (AR 60), whereas Dr. Ahmed found that it was "[l]imited [l]eft" (AR 66). The form asked the doctors to explain their assessment of Toney's visual limitations, including "how and why the evidence support your conclusions," and to "[c]ite specific facts upon which your conclusions are based." In response, each doctor stated merely: "No Light Perception vision L eye. Aphakia, L eye." (AR 60, 66).

Thus, both Dr. Naroditsky and Dr. Ahmed noted only that Toney's depth perception in his left eye was "limited." They made no attempt to describe how "limited" his depth perception was, and offered no assessment of how Toney's blindness in his left eye impacted his overall depth perception, or how his right-eye visual impairments affected his depth perception. These reports thus likewise fail to substantiate the ALJ's finding that Toney was capable of "frequent depth

perception." *See Decambre*, 2016 WL 951532, at *9–10 ("[T]he record is silent as to the effect of [p]laintiff's right-eye blindness on his depth perception. Although Dr. Thurkal observed that [p]laintiff was blind in his right eye with decreased visual acuity in the left eye, he did not indicate the extent that [p]laintiff's right-eye blindness affects his depth perception."); *Daniel E.S.*, 2020 WL 1172130, at *9 (remanding action where there was "no indication from the opinions of [SSA physicians] what frequency or type of depth perception [p]laintiff is capable of given his severe impairments to his vision"); *Reed*, 2018 WL 4520363, at *4 (rejecting Commissioner's claim that ALJ's visual limitation findings were supported by the opinion of a non-examining doctor who stated that plaintiff had "limited" depth perception and other visual functions due to her blind left eye, but "did not state . . . that [p]laintiff had 'frequent' limitations in these visual function categories").

Moreover, while Drs. Naroditsky and Dr. Ahmed both opined that, whether or not Toney could perform his past relevant work, he could "adjust to other work" and hence was "not disabled" (AR 61, 67), those opinions ultimately do not support the ALJ's step five finding either. The ALJ specifically found, based on the vocational expert's testimony, that Toney was not disabled because he could perform the jobs of hand launderer, laboratory equipment cleaner, or kitchen helper. (AR 23–24). Neither Dr. Naroditsky nor Dr. Ahmed offered any opinion as to whether Toney had the visual functionality to perform those jobs, and it would be especially unreasonable to infer from their reports that Toney did have that functionality given that neither doctor appears to have any specialty or expertise in

the area of ophthalmology. (*See* AR 62 (identifying Dr. Naroditsky as a specialist in internal medicine); AR 68 (identifying Dr. Ahmed as a specialist in cardiology)). *See Ting v. Comm'r of Soc. Sec.*, No. 23 Civ. 1241 (PKC), 2024 WL 815841, at *8 (E.D.N.Y. Feb. 27, 2024) (finding that ALJ's reliance on a single consultative examination and "the opinions of state agency review physicians who did not examine the claimant and were not specialists in the claimant's disability" did not constitute substantial evidence).[4]

SSR 96-8p requires the ALJ to provide a discussion of evidence supporting an RFC. "Although '[n]othing in the regulation indicates that an ALJ's ultimate determination . . . of RFC must comport with a specific medical opinion,' the lack of a medical opinion that supports the ALJ's conclusion is 'not insignificant.'" *Nunez v. Comm'r of Soc. Sec.*, 164 F.4th 60, 71–72 (2d Cir. 2025) (quoting *Rubin*, 116 F.4th at 155–56); *see also Lukasik v. Comm'r of Soc. Sec.*, No. 19 Civ. 760S (WMS), 2020 WL 2110593, at *5 (W.D.N.Y. May 4, 2020) (remanding action where there was "no medical opinion that addresse[d]" plaintiff's spine and foot issues and the ALJ did not "rely upon a medical source's opinion in considering the limitations, if any, associated with" plaintiff's impairments); *Arias v. Saul*, No. 18 Civ. 1296 (KAM), 2020 WL 1989277, at *7 (E.D.N.Y. Apr. 25, 2020) ("The ALJ should have obtained a

[4] To be sure, "there is nothing in the applicable regulations that requires that an ALJ reject a medical opinion simply because a doctor is not a specialist in a particular field," and an ALJ "can appropriately rely on the opinions of medical consultants who are not specialized in a relevant field if those opinions are supported by other evidence on the record." *Ana R. v. Comm'r of Soc. Sec.*, No. 24 Civ. 8802 (ER) (SN), 2026 WL 210411, at *6 (S.D.N.Y. Jan. 6, 2026). But here, Dr. Naroditsky and Dr. Ahmed did not make a specific or a supported assessment as to Toney's depth perception functional capacity.

medical opinion from a qualified source, as her RFC could not stand if unsupported by at least one medical opinion."); *Biro v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 464, 471–72 (W.D.N.Y. 2018) (noting that an ALJ cannot render a common-sense judgment about a claimant's functional capacity where the record "contains complex medical findings and does not suggest only minor impairment" (internal quotations omitted)); *Muhammad*, 2017 WL 4837583, at *4 ("While in some circumstances, an ALJ may make an RFC finding without treating source opinion evidence, the RFC assessment will be sufficient only when the record is 'clear' and contains 'some useful assessment of the claimant's limitations from a medical source.'" (citation omitted)).

Given the lack of any medical opinion, from either the treating physician, the consultative examiner, or the non-examining state agency physicians, as to the degree of Plaintiff's depth perception and specifically as to how Plaintiff's left-eye blindness coupled with his right-eye glaucoma and other visual limitations affected his depth perception—a matter which clearly requires more than a common sense judgment—the ALJ's determination lacks an adequate foundation in the record.

**C. Medical Records**

The Commissioner's contention that "[a]dditional medical findings of record," including the treatment notes from Dr. Yao and other treating physicians, support the ALJ's RFC determination is equally unavailing. (*See* Gov. Br. at 9).

The ALJ stated that Plaintiff's vision in his right eye "has been stable at 20/30 to 20/40." (AR 22). But this ignores the tests taken on June 4, 2023, July 6,

2023, October 18, 2023, November 2, 2023, and February 1, 2024, all of which included measurements at 20/50 or 20/60. (AR 388, 458, 507, 519, 530). Indeed, as outlined above (*see* Background § B), Toney's right eye vision appeared to deteriorate over time, rather than remain "stable." Similarly, although the ALJ stated that Plaintiff had "undergone conservative care with eye drops prescribed" for treatment of his right-eye condition (AR 22), he failed to note that Plaintiff had received laser surgery for that condition in November 2023 (AR 517, 524).

More importantly, the treatment notes indicate that Toney's right-eye glaucoma was worsening. Whereas Dr. Yao initially merely suspected that Toney suffered from glaucoma in his right eye, in October 2023 she diagnosed Toney with primary open angle glaucoma in the right eye, moderate stage. (AR 526). That diagnosis is not mentioned in the ALJ Decision. Nor was it mentioned in the reports issued by Dr. Kushner, Dr. Naroditsky, or Dr. Ahmed, as those doctors were all unaware of it at the time of their reports.[5] Significantly, studies have found that individuals with primary open angle glaucoma "showed significant reduction in depth perception," with depth perception decreasing as the severity of the glaucoma increases. *See* Pragati Gautam Adhikari, "Evaluation of depth perception and association of severity in Glaucoma patients and suspects," *BMC Ophthalmol* (Dec. 2021), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8672595/. Yet neither the ALJ Decision nor any of the medical opinions upon which the ALJ relied

[5] Dr. Kushner's examination took place on June 22, 2023, and Dr. Naroditsky's report was issued on July 17, 2023, both before Dr. Yao's diagnosis, which was made on October 18, 2023. (AR 62, 433). Dr. Ahmed issued his report on October 19, 2023, but there is no indication in his report and no reason to believe that he was aware of Dr. Yao's diagnosis made just the day before. (See AR 63–68).

attempted to assess the impact on Toney's depth perception based on his having moderate stage glaucoma in his right-eye coupled with his monocular vision (*i.e.*, left-eye blindness). *See Edwards v. Comm'r of Soc. Sec. Admin.*, No. 22 Civ. 4345 (RWL), 2023 WL 6173526, at *16 (S.D.N.Y. Sept. 22, 2023) ("[A] medical opinion may be stale if subsequent treatment notes indicate a claimant's condition has deteriorated." (citation omitted)).

It is noteworthy that the later treatment notes from Dr. Yao showing declines in Toney's visual acuity, laser surgery treatment, and the diagnosis of moderate stage glaucoma were not provided to the ALJ until after the May 14, 2023 hearing. (AR 36, 54). Although the ALJ Decision clearly notes receipt of these medical records and inclusion of them in the record as Exhibit 16F (AR 17), the ALJ's RFC analysis does not explicitly mention or cite any of these notes or the findings contained therein. The record thus suggests that the ALJ overlooked these medical records, a fact that tends to undermine the ALJ's RFC finding. *See Sanchez v. Saul*, No. 18 Civ. 12102 (PGG) (DF), 2020 WL 2951884, at *32 (S.D.N.Y. Jan. 13, 2020) (remanding action where, *inter alia*, the ALJ "did not explicitly mention" certain treatment records in his decision and the record "suggest[ed] that he overlooked them completely"), *R&R adopted*, 2020 WL 1330215 (S.D.N.Y. Mar. 23, 2020); *Hall v. Astrue*, No. 12 Civ. 6639P (MWP), 2014 WL 4924009, at *10 (W.D.N.Y. Sept. 30, 2014) (remanding action where there was a "strong likelihood [ ] that the ALJ overlooked [plaintiff's] treatment records" discussing plaintiff's pain management treatment); *Wilcox v. Comm'r of Soc. Sec.*, No. 13-CV-12549, 2014 WL 4109921, at

*10 (E.D. Mich. Aug. 19, 2014) (remanding action as, *inter alia*, the "RFC assessment [wa]s also undermined by the ALJ's failure to discuss several pertinent medical records"); *Boggs v. Colvin*, No. EDCV 13-1599 FFM, 2014 WL 6976998, at *3 (C.D. Cal. Dec. 9, 2014) (finding that remand was required where the ALJ "simply overlooked (and perhaps was not even aware of)" medical records where such records "appear to be material" and it could not "be known whether the ALJ's impression of plaintiff's credibility would have been different had the ALJ considered these additional medical records").

Accordingly, the treatment notes and other medical records likewise fail to provide substantial evidence for the ALJ's finding.

**D. Activities of Daily Living**

Finally, the Commissioner urges that Toney's reported activities of daily living, including, *inter alia*, independent care of personal needs, occasional cooking, and socializing with friends and family, "amply" support the ALJ's decision. (Gov. Br. at 9). Once again, the Court disagrees.

"Where there is conflicting evidence about a claimant's [symptoms], the ALJ must make credibility findings." *Newman v. Berryhill*, No. 16 Civ. 9325 (AJP), 2017 WL 4466615, at *13 n.12 (S.D.N.Y. Oct. 6, 2017) (citation omitted). Ultimately, an "ALJ ha[s] significant discretion to discount . . . Plaintiff's [subjective statements] in light of . . . other objective evidence." *Garcia v. Astrue*, No. 07 Civ. 6658 (DAB), 2009 WL 212405, at *7 (S.D.N.Y. Jan. 29, 2009); *see Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("As a fact-finder, the

ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence." (cleaned up)).

Of course, an ALJ cannot cherry-pick evidence. *See Scognamiglio v. Saul*, 432 F. Supp. 3d 239, 252 (E.D.N.Y. 2020) (finding ALJ's choice "to disregard [plaintiff's] statements in favor of a handful of anecdotes that would seem to indicate [p]laintiff's normal functionality" was error). Nonetheless, "an ALJ is not required to discuss all the evidence submitted, and his failure to cite specific evidence does not indicate that it was not considered." *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005) (citation omitted). Pursuant to SSR 96–7p, an ALJ's explanation of his determination as to the credibility of a claimant's subjective statements "'must be *sufficiently* specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Burden v. Astrue*, No. CIV. 3:07CV0642 JCH, 2008 WL 5083138, at *14 (D. Conn. Aug. 26, 2008) (quoting SSR 96–7p) (emphasis added), *R&R adopted*, 588 F. Supp. 2d 269 (D. Conn. 2008). The ALJ may reject a claimant's subjective statements when he or she has stated his or her reasons for doing so with "sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence," and so to "decide whether there are legitimate reasons for the ALJ's disbelief." *Ritter v. Astrue*, 32 F. Supp. 3d 193, 206–07 (N.D.N.Y. 2012) (cleaned up).

The ALJ pointed to several reported activities of daily living which he found "not entirely consistent" with Plaintiff's descriptions of his symptoms and limitations. (AR 21–22).[6] In support of that position, the ALJ cited Toney's statements in his function report that he was "able to perform personal care at his own pace; accompanied his girlfriend to the grocery store; paid bills and counted change; watched TV; listened to music; talked on the phone and in person with others and got along with people." (AR 22).

But whether Toney is able to listen to music, talk on the phone, or generally get along with people bears no apparent logical relationship to his vision generally or his depth perception specifically, nor did the ALJ explain why he relied on these activities. Similarly, although Toney may be able to perform personal care at his own pace and count change, this does not indicate that he can perform those actions at the speed or efficiency necessary to maintain gainful employment.

Further, the ALJ omitted important context for several of these statements. Although Toney did admit to occasionally traveling with his girlfriend, he clarified that they normally did so via taxi, that she took responsibility for nearly all household chores, and that she typically cooked for him. (AR 38, 43). Toney testified that he rarely traveled independently as he worried about his ability to get home alone. (AR 43–44). With respect to socializing with friends and family, Toney clarified that they normally traveled to his house to do so. (AR 44). Finally, Toney testified that his eyes "burn[ed]" when he watched TV. (AR 42; *see* also AR 220).

---

[6] Immediately prior, the ALJ described the claimant's statements as "inconsistent with the objective evidence in the case record," rather than merely "not entirely consistent." (AR 21).

Moreover, Toney testified to several important activities of daily living which, despite their relevance, the ALJ did not mention. Plaintiff testified that he "constantly" walked into a particular wall in his home when making a right turn to go to the bathroom. (AR 41). He testified explicitly that his depth perception was "off" and that, as a result, he had to "hold on" when using sidewalks or staircases. (*Id.*). Toney also testified that his "height judgment" was off when stepping off curbs or using the stairs, and that he had recently fallen off a three-foot ravine that he believed was on level ground. (AR 42–43). He also testified that he no longer drove a car. (AR 38; *see also* AR 223). Finally, in his function report, Toney reported only being able to pay attention for 15-20 minutes before requiring a break due to headaches. (AR 206).

Much of this testimony goes directly to Plaintiff's depth perception, yet went unmentioned by the ALJ. The ALJ's failure to explain why these highly relevant pieces of testimony were disregarded, while simultaneously relying on seemingly irrelevant facts such as Toney's ability to "listen" to the radio and "talk" on the phone, substantially reduces the weight of the ALJ's finding and highlights the need for a remand. *See Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 422 (S.D.N.Y. 2010) ("Courts in this Circuit have long held that an ALJ's 'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" (quoting *Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002))).

* * *

Whether the four categories of evidence relied upon by the Commissioner are considered singly or in combination, the Court concludes that substantial evidence does not support the ALJ's RFC finding that Toney could perform medium-work jobs requiring "frequent depth perception" despite his severe visual impairments. Because the Commissioner does not dispute that this is the critical issue on appeal or seek affirmance on any other ground, and in light of the vocational expert's testimony indicating that Toney would not be able to perform these jobs if his depth perception was more seriously impaired, the lack of support for the ALJ's finding cannot be viewed as harmless, and a remand is required. *See Cosnyka v. Colvin*, 576 F. App'x 43, 46 (2d Cir. 2014) ("Because there is no substantial evidence for the ALJ's [specific RFC formulation included in the ALJ's hypothetical to the vocational expert], and this formulation was crucial to the vocational expert's conclusion that there were jobs [plaintiff] could perform, we cannot uphold the ALJ's decision to reject [plaintiff's] claim for benefits.").[7]

[7] There was perhaps a harmless error argument that the Commissioner could have made. Based on the Court's review of the job requirements in the Dictionary of Occupational Titles ("DOT") for the three jobs identified by the vocational expert, it appears that depth perception at the frequent (or any other) level is not required. *See* Launderer, Hand, DOT 361.684-010, 1991 WL 672982 (4th ed. 1991); Cleaner, Laboratory Equipment, DOT 381.687-022, 1991 WL 673259 (4th ed. 1991); Kitchen Helper, DOT 318.687-010, 1991 WL 672755 (4th ed. 1991). Theoretically, this could mean that any error in assessing Toney's functional limitations related to depth perception would be harmless. *See, e.g.*, *Little v. O'Malley*, No. 8:23-cv-245-AEP, 2024 WL 962289, at *6 (M.D. Fla. Mar. 6, 2024) ("Finally, even if this Court were to accept [p]laintiff's assertions concerning the persistence of symptoms in her right eye, as pointed out by [d]efendant two of the three jobs cited by the vocational expert require no near acuity, far acuity, depth perception, and field of vision. Therefore, plaintiff's argument fails for this reason as well." (citations omitted) (citing cases)). But the Commissioner makes no harmless error argument, and regardless of what is in the DOT, Atkinson's testimony assumed that if Toney could only occasionally accurately perceive objects due to impaired depth perception, he would be precluded from performing the three cited occupations. (AR 52). Under these circumstances, the Court will not *sua sponte* reach the question of harmless error.

In reaching the conclusion, the Court recognizes that Toney did not submit an opinion from his treating physician or another medical source specifying the extent of his functional limitations arising from his visual impairments. But the medical evidence that Toney did submit showed that those impairments were serious—total blindness in his left eye, and moderate stage glaucoma in his right. Taken together with Toney's own testimony about his blurred vision and functional limitations; the ALJ and vocational expert's recognition that Toney could not perform his past relevant work; and the undisputed fact that (given his age, education, and work experience) Toney could not be transferred to light or sedentary work, the medical evidence was sufficient to raise a genuine question as to whether Toney was disabled. Under these circumstances, before concluding that Toney was disabled, it was incumbent upon the ALJ to more fully develop the record as to the functional limitations arising from Toney's visual impairments.

Given the evidentiary gap, the Court finds, as have other courts when faced with similar circumstances where the plaintiff's depth perception was critical to the disability analysis, that remand is appropriate. *See, e.g.*, *Decambre*, 2016 WL 951532, at *9–10; *Verdaguer*, 2013 WL 6426931, at *11–12; *Kara K.*, 2025 WL 3199070, at *4; *Daniel E.S.*, 2020 WL 1172130, at *9; *Reed*, 2018 WL 4520363, at *4; *see also Kirkland v. Astrue*, No. 06 Civ. 4861 (ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (noting that remand is appropriate where, as here, "due to inconsistencies in the medical evidence and/or significant gaps in the record,

'further findings would . . . plainly help to assure the proper disposition of [a] claim.'" (quoting *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004))).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion is **GRANTED** and the case is remanded to the SSA for further proceedings consistent with this opinion.

**SO ORDERED.**

DATED: New York, New York
September 17, 2026

GARY STEIN
United States Magistrate Judge